IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

SAMUEL RAMOS-BONILLA,

Defendant.

CRIM. NO.: 25-063 (SCC)

**OPINION AND ORDER**

Mr. Samuel Ramos-Bonilla ("Mr. Ramos-Bonilla") stands charged of six counts, including possession of a controlled substance with intention to distribute, possession of a machinegun and possession of a firearm in furtherance of a drug crime, all in violation of Title 18 of the U.S. Code. *See* Docket No. 12. Mr. Ramos-Bonilla now moves the Court to suppress certain incriminating statements made to law enforcement on Fifth Amendment grounds. *See* Docket No. 57, pg. 1. Specifically, he seeks the suppression of statements made during the execution of the search warrant, and those made in the suspect statement form he filled out at the police station after having asserted his rights via the Puerto Rico Police Bureau ("PRPB")'s *Miranda* form. *Id.*; *see also* Docket No. 66, pg. 2. The Government opposed the motion, *see* Docket No. 61, Mr. Ramos-Bonilla replied, *see* Docket No. 66, and the Government sur-replied, *see* Docket No. 71.

The Court held evidentiary hearings on April 10, 2026, June 11, 2026, and June 18, 2026, after which the Court ordered the parties to file supplemental briefs. *See* Docket No. 105. The same were subsequently filed. *See* Docket Nos. 113, 114. For the reasons set forth below, the Court **DENIES in part and GRANTS in part** Mr. Ramos-Bonilla's Motion to Suppress at Docket No. 57.

## I. Findings of Fact

During the evidentiary hearings, the Government presented the testimonies of Officers Arelie Ortega-Goveo ("Officer Ortega") and Félix A. De Jesús-Abreu ("Officer De Jesús-Abreu").[1] Mr. Ramos-Bonilla presented the testimonies of Officer Elliot Burgos-Avilés ("Officer Burgos"), Officer Julio A. Rivera-Padro ("Officer Rivera"), Officer Luis M. Beltrán-Rivera ("Officer Beltrán"), and Ms. Celeste M. De Jesús-Flores ("Ms. De Jesús-Flores"). All the officers that testified were employed by the PRPB. *See* Docket No. 94, pgs. 9, 85; *see also* Docket No. 103, pgs. 7, 23, 38.

### A. Officer Ortega

Officer Ortega testified first for the Government. *See* Docket No. 94, pg. 9. She testified that she had been working

[1] Because Félix A. De Jesús-Abreu and Celeste M. De Jesús-Flores share the same surname, the Court shall refer to them using both of their last names.

for the PRPB for around six years and presently served in the Carolina Drug Division. *Id.* at pgs. 9-10. On January 29, 2025, Officer Ortega was assigned to execute a search and seizure warrant in Canóvanas.[2] *Id.* at pgs. 11-12. In her description of the operation, Officer Ortega testified that there was an "entry team" tasked with "tak[ing] care of securing the residence and restraining the people inside[.]" *Id.* at pg. 13.

Officer Ortega testified that, upon entering the home, she saw Mr. Ramos-Bonilla and Ms. De Jesús-Flores next to three to four minors. *Id.* at pg. 14.[3] She indicated that Mr. Ramos Bonilla "was in the custody of the SWAT team and was restrained . . . . [with] straps." *Id.*[4] According to her testimony, Officer Ortega introduced herself to Mr. Ramos-Bonilla,

---

[2] For the task of searching the home, Officer Ortega was accompanied by Officers Burgos, Kenny Neváarez, and Sergeant José Olivo. *See* Docket No. 94, pg. 19. Officer Kenny Nevárez and Sergeant José Olivo did not testify in the suppression hearings. Officer Kenny Nevárez was assigned as the note taker; however, his notes were not introduced as evidence. *Id.* at pgs. 12, 25. Sergeant José was there to supervise the execution of the search warrant. *Id.* at pg. 19.

[3] Although Officer Ortega's testimony was initially that she remembered seeing three to four minors at the residency, the record reflects that there were five minor children at the house on January 29, 2025. *See* Suppression Hearing Transcript, June 18, 2026, pg. 6.

[4] Although Officer Ortega testified that Mr. Ramos-Bonilla was restrained with straps, she could not remember Mr. Ramos Bonilla's hand placement. *See* Docket No. 94, pg. 14.

showed him the search warrant and provided him with details as to how the search was going to be carried out. *Id.* at pgs. 15-16. While in the living room, Officer Ortega asked "who was [] in charge of the residence[,]" to which "they brought up that the residence was not theirs, that it belonged to a relative. But at that moment, [Mr. Ramos-Bonilla] assumed responsibility[.]" *Id.* at pgs. 17-18.

After informing Mr. Ramos-Bonilla and Ms. De Jesús-Flores of the execution of the search warrant, Officer Ortega called for the canines to enter the residence. *Id.* at pgs. 18-19. According to her testimony, "after the canine had entered, then [she] started the search of the residence." *Id.* at pg. 21.

Officer Ortega began her search in the kitchen and then proceeded to search the living room, where she found a black plastic container with marijuana shredding inside. *Id.* Once she identified the controlled substance, Officer Ortega asked Mr. Ramos-Bonilla if he had a medicinal cannabis license, to which "[h]e said he did not." *Id.* at pg. 22. After receiving his answer, Officer Ortega verbally read him the *Miranda* warnings. *Id.* In response to being read his rights, Mr. Ramos-Bonilla "didn't say anything and just moved his head . . . as if to show that he understood the same." *Id.*

The search continued in Mr. Ramos-Bonilla's room. *Id*. There, Officer Ortega found a grocery bag atop a dresser with "substances and money" inside. *Id.* at pg. 23. While still in the master bedroom, Mr. Ramos-Bonilla expressed to Officer Ortega that "he did not want his partner . . . to be involved in the process." *Id.* at pg. 24. Officer Ortega replied that "anybody present in the residence was part of the process, but the Prosecutor would be the one to make such a decision." *Id.* at pgs. 24-25. Agent Ortega testified that the only other person next to her when this happened was Officer Kenny Nevarez. *Id.* at pg. 25. After searching the rest of the house, Officer Ortega states that no further controlled substances were found. *Id.* at pg. 24.

Officer Ortega also testified that she found a firearm at the lower part of the residence. *Id.* at pg. 25. She detailed that she knew there was a firearm there because "the canine alerted to the presence of the firearm," and because Mr. Ramos-Bonilla allegedly pointed to where the firearm was. *Id.* Officer Ortega further testified that Mr. Ramos-Bonilla pointed to an area "like a room or a basement" under the house. *Id.* at pg. 26. There, a Glock, two magazines, and ammunition were seized. *Id.* at pg.

27. Upon finding the gun, Officer Ortega asked Mr. Ramos-Bonilla if he had a permit for it, to which he responded in the negative. *Id.*

After retrieving the firearm, Officer Ortega returned to the living room with Mr. Ramos-Bonilla—where Ms. De Jesús-Flores was also being detained—and informed the two of them of what was going to take place and that they would need to find somebody to stay with the children. *Id.* at pgs. 27-28. Officer Ortega recounted that they allowed Ms. De Jesús-Flores to make some phone calls, including a call to the children's grandmother. *Id.* at pg. 28. Additionally, Officer Ortega noted that the Puerto Rico Department of Family Affairs (the "Family Department") had been contacted, as is "customary" in these types of cases. *Id.* at pg. 29. Officer Ortega also testified that she explained this to Mr. Ramos-Bonilla and Ms. De Jesús-Flores. *Id.*[5]

Approximately thirty minutes after Ms. De Jesús-Flores made the calls, the grandmother arrived at the house. *Id.* at pg.

[5] Officer Ortega testified as follows:

> And I remember that I explained to them the process, both of them, about this call to notify the Family Department, that it was part of my duties to notify the Family Department, and that there the investigation and process that would be carried out by the Family Department had nothing to do with me. *See* Docket No. 94, pg. 29.

28. Officers at the scene wrote down the grandmother's personal information and told her that either Officer Ortega or the Family Department would be contacting her. *Id.* at pg. 29. Mr. Ramos-Bonilla, Ms. De Jesús-Flores, and her eldest son were transported to the precinct, while the other four children were left with the grandmother. *Id.* at pgs. 29-30.

Once they arrived at the police precinct, the three of them were "placed under custody in the academy hall area." *Id.* at pg. 30. The person in charge of their custody was Officer De Jesús-Abreu. *Id.* at pg. 36. At the academy hall, Officer Ortega wrote down their general information and handed them each a PRPB *Miranda* form. *Id.* at pgs. 31, 36. Officer Ortega then gave them some time to fill out the form while she verified the case file. *Id.* at pgs. 37-38. Approximately twenty-five to thirty minutes after picking up the signed forms, she testified that "Mr. [Ramos] Bonilla expressed . . . again that he wanted [Ms. De Jesús-Flores] to remain out of the process, and that everything that was found in the residence was his." *Id.* at pgs. 39-40. According to Officer Ortega, Ms. De Jesús-Flores was "[r]ight next to him" when he said this. *Id.* at pg. 40. Officer Ortega recounted that she responded by stating that he would

need to write down his statements and followed up by producing the form PPR-615.9 (the "Suspect Statement Form"). *Id.* at pgs. 40-41.

Officer Ortega handed Mr. Ramos-Bonilla the Suspect Statement Form and went two tables apart from him. *Id.* at pg. 44. She handed it to him at 12:04 PM and received it at 12:15 PM. *See* Docket No. 62-1, pg. 2. Afterwards, Officer Ortega signed the Suspect Statement Form, as did Officer Nelishka De Jesús, "who was . . . present in the Academy Hall." *See* Docket No. 94, pg. 45.

Officer Ortega also testified that while at the precinct, she contacted the Family Department to report that she had executed a search warrant and found controlled substances and firearms in a residence with minors. *Id.* at pg. 46. Officer Ortega testified that she did not remember what she told Mr. Ramos-Bonilla and Ms. De Jesús-Flores regarding the call she made to the Family Department. *Id.* at pgs. 46-47. However, she did testify to "ask[ing] them for information pertaining to the minors for the Family Department." *Id.* at pg. 47.

**B. Officer De Jesús-Abreu**

Next, the Government called Officer De Jesús-Abreu. *See* Docket No. 94, pg. 85. Officer De Jesús-Abreu has worked for the PRPB for five years and is currently assigned to the

Intelligence and Arrest Division of Carolina. *Id.* On the morning of January 29, 2025, he was assigned to cover the perimeter in the execution of the search warrant. *Id.* at pg. 86. Under that role, Officer De Jesús-Abreu remained outside throughout the operation. *Id.* Once it had been completed, Officer De Jesús-Abreu moved to the Metropolitan Drug Division in Guaynabo. *Id.* at pgs. 86-87.

Officer De Jesús-Abreu described the Academy Hall where Mr. Ramos-Bonilla and Ms. De Jesús-Flores were placed in as a "very open" room with several tables and chairs. *Id.* at pg. 88. Officer De Jesús-Abreu testified that his role in the Academy Hall was to keep custody of Mr. Ramos-Bonilla and Ms. De Jesús-Flores. *Id.* He testified that he saw Officer Ortega approach them on various occasions. *Id.* at pg. 89. Among those occasions, he testified that he was present when Officer Ortega handed them the *Miranda* warnings form. *Id.* Specifically, Officer De Jesús-Abreu testified: "[He] saw that [Officer Ortega] read the document to them. Then she – after she had handed over the documents to them, she then asked [him] to come by to sign the Miranda rights form." *Id.* After signing the form containing the *Miranda* warnings, Officer De Jesús-Abreu kept custody of Mr. Ramos-Bonilla and Ms. De Jesús-Flores until 11:00 am. *Id.* at pg. 90.

**C. Officer Burgos**

As his first witness, Mr. Ramos-Bonilla called Officer Burgos. *See* Docket No. 103, pg. 7. Officer Burgos testified that he had been working for the PRPB for seven years and currently works in the Division of Technical Services. *Id.* On January 29, 2025, Officer Burgos was assigned with photographing the execution of the search warrant. *Id.* at pgs. 8, 12. In his testimony, he described the procedure he generally follows when photographing the execution of a search warrant. *Id.* at pgs. 10-11.[6]

Officer Burgos testified that, throughout the execution of the search warrant, he never heard Mr. Ramos-Bonilla admit to ownership of the controlled substances nor mention that he wanted to exclude his "wife" from of the process. *Id.* at pg. 14. He further testified that he did not photograph Mr. Ramos-Bonilla pointing out the firearm. *Id.* Nor did he remember hearing any officer read Mr. Ramos-Bonilla the *Miranda* warnings while inside the house. *Id.* at pg. 15.

**D. Officers Rivera and Beltrán**

Mr. Ramos-Bonilla then called Officers Rivera and

[6] Officer Burgos described his method as a "step-by-step process" where he takes photos of the rooms, the evidence found, and of the procedure in general. *See* Docket No. 103, pgs. 10-11. He also testified that he has discretion in selecting what to photograph. *Id.* at pg. 22.

Beltrán. *See* Docket No. 103, pgs. 23, 38. Both Officers detailed their experience as canine operators for the K-9 Division in Bayamón. *Id.* at pgs. 24, 38. Both Officers were the designated canine handlers for the execution of the search warrant on January 29, 2025. *Id.* at pgs. 25, 39. Although both Officers testified to having searched the house, Officer Rivera specifically testified that his canine marked the firearm found outside of the residence. *Id.* at pg. 33.

The questions towards Officers Rivera and Beltrán were aimed at whether they heard Officer Ortega advise Mr. Ramos-Bonilla of his rights and whether any of them saw him point out the weapon. *Id.* at pgs. 33-36, 42. Neither Officer testified to hearing anyone recite Mr. Ramos-Bonilla the *Miranda* warnings. *Id.* at pgs. 35-36, 42. For his part, Officer Rivera, who was present when the firearm was found, testified that he did not see Mr. Ramos-Bonilla pointing towards the location of the firearm found. *Id.* at pg. 37. He also reiterated that while a search is being conducted, his sole focus is his canine. *Id.* at pgs. 30, 32-34, 36-37.

**E. Ms. De Jesús-Flores**

Lastly, Mr. Ramos-Bonilla called Ms. De Jesús-Flores to testify. *See* Suppression Hearing Transcript, June 18, 2026 (“June 18 Supp. Hr’g Tr. June 18”). She testified to being Mr.

Ramos-Bonilla's consensual partner and having four children with him. *Id.* at pg. 4. She testified that on the morning of January 29, 2025, she woke up to feed her youngest child, when she heard voices outside of her house. *Id.* at pg. 6. She further testified that the police broke down the door to enter her house. *Id.*

Ms. De Jesús-Bonilla further testified that, while the search was being conducted, she was placed in front of the door that led to the living room. *Id.* at pgs. 8-9; *see also* Def. Ext. B (in the area in front of the darker door). She also testified that on that morning, the doors and windows were open, and that she could hear everything from where she was standing. *See* June 18 Supp. Hr'g Tr., pg. 9.

Ms. De Jesús narrated that she was arrested after the search had concluded and that the police officers read her the *Miranda* warnings prior to being placed inside the patrol car. *Id.* at pgs. 12-13. She also testified that before that moment, she had not heard any of the officers recite the *Miranda* warnings. *Id.* She further said that her eldest son, who was fourteen at the time, was taken to the precinct with her. *Id.* at pg. 10.

At the precinct, Ms. De Jesús testified to being next to Mr. Ramos-Bonilla when he signed the PRPB Form, opting not to waive his Fifth Amendment rights. *Id.* at pg. 15. Ms. De Jesús-

Flores stated that Officer Ortega told Mr. Ramos-Bonilla that "she was going to bring him a form for him to fill out in order to exclude both [her] and [her] children to keep [them] out of the case." *Id.* at pg. 16; *see also* Docket No. 62-1, pg. 2. After Mr. Ramos-Bonilla filled out the Suspect Statement Form, Ms. De Jesús-Flores was taken to an adjacent room, where the police verified her cellphone and let her leave. June 18 Supp. Hr'g Tr., pg. 17.

In addition to testifying, Ms. De Jesús-Flores provided a declaration under penalty of perjury. *See* Docket No. 57-2. There, she stated that she had been arrested around 6:00 AM and that later, around 12:00 PM, Officer Ortega told Mr. Ramos-Bonilla that if he signed a confession, the police would release her. *Id.* According to the statement, once Mr. Ramos-Bonilla signed the confession, the police let go of Ms. De Jesús-Flores. *Id.*

**F. Mr. Ramos-Bonilla**

Although Mr. Ramos-Bonilla did not testify at the evidentiary hearings, he provided a declaration under penalty of perjury in support of his Motion to Suppress. *See* Docket No. 57-1. There, Mr. Ramos-Bonilla denied having told the police that the contraband found in the house was his and denied having pointed to the firearm or telling the police of its location.

*Id.* at pg. 1. Furthermore, Mr. Ramos-Bonilla affirms that, two hours after having invoked his right to remain silent and to counsel on the PRPB form, Officer Ortega interrogated him and obtained a written statement. *Id.* at pg. 2. He stated that PRPB officers guaranteed that, if he took responsibility of the firearms and the controlled substances found in the house, they would release Ms. De Jesús-Flores and her 14-year-old son and not call the Family Department. *Id.*

## II. Analysis

Mr. Ramos-Bonilla challenges the admissibility of two groups of statements: the statements allegedly made in his house during the execution of the search warrant and the written statement signed in the precinct. The Court addresses them in turn.

### A. Statements Made During the Execution of the Search Warrant

Mr. Ramos-Bonilla argues that his statements to the police should be suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1996). Under *Miranda*, warnings must be given before "a person [is] questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444); *see also United States v.*

*Simpkins*, 978 F.3d 1, 9 (1st Cir. 2020). "Absent such warnings, most statements that officers obtain during a custodial interrogation are inadmissible at trial." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020). Thus, for the challenged admissions to be suppressed, Mr. Ramos-Bonilla must have been in custody and interrogated without having received *Miranda* warnings. *United States v. McCarty*, 475 F.3d 39, 45 (1st Cir. 2007); *see also Carpentino*, 948 F.3d at 20.

The Court begins with the question of custody. The statements Mr. Ramos-Bonilla seeks to suppress were allegedly proffered while he was restrained by the PRPB officers conducting the search warrant. *See* Docket No. 94, pgs. 14, 64. Federal courts have found that a person is not automatically considered to be in custody simply because he was detained during the execution of a search warrant. *United States v. Crooker*, 688 F.3d 1, 10-12 (1st Cir. 2012); *see also United States. v. Widi*, 686 F.Supp.2d 107, 111-12 (D. Me. 2010). Rather, the Court must determine if Mr. Ramos-Bonilla's freedom was curtailed to "the degree associated with a formal arrest." *United States v. Mittel-Carey*, 439 F.3d 36, 39 (1st Cir. 2007) (quoting *Stansbury*, 511 U.S. at 322). Factors that aid this decision-making are: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers

present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)). However, these factors are not exhaustive, and the Court must consider the totality of the circumstances. *United States v. Monson*, 72 F.4th 1, 10 (1st Cir. 2023).

In this case, Mr. Ramos-Bonilla was restrained by the PRPB officers executing the search warrant. *See* Docket No. 94, pg. 64. Although Mr. Ramos-Bonilla was not in handcuffs, Officer Ortega testified that he was restrained with "straps."[7] *Id.* at pg. 14. Furthermore, Mr. Ramos-Bonilla was accompanied throughout the execution of the search warrant by PRPB officers. *Id.* at pg. 64. Lastly, the Court notes that the number of PRPB officers deployed for the execution of search warrants is "more than [twenty]". *Id.* at pg. 12. No reasonable person under these circumstances would have felt free to leave. *See Mittel-Carey*, 493 F.3d at 39-40. Therefore, the Court finds that Mr.

[7] The Court notes that there is some controversy regarding Mr. Ramos-Bonilla's restraints. For example, in Gov. Ext. 1-C, Mr. Ramos-Bonilla's hands appear untied. The Court also notes that it is Officer Ortega's testimony that indicates Mr. Ramos-Bonilla "pointed" to the firearm. *See* Docket No. 94, pgs. 25-26. Regardless of these potential inconsistencies, the Court finds that Mr. Ramos-Bonilla was restrained at the beginning of when the search warrant was executed and throughout the execution of the same. *See* Docket No. 94, pg. 64.

Ramos-Bonilla was in custody when he made the challenged statements.

The question then is whether Mr. Ramos-Bonilla's statements were the result of an interrogation. An interrogation occurs where "there is 'express questioning . . . [or] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *McCarty*, 475 F.3d at 45 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980)).

Mr. Ramos-Bonilla first contends that Officer Ortega's question regarding ownership of the house was an incriminating question. *See* Docket No. 114, pgs. 2-3.[8] The Court finds that this question falls squarely within the routine booking exception, for which the officers were not obligated to advise him of his rights. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990). The routine booking exception is a "well-established line of case law authority" establishing an exception to *Miranda*. *See United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989). For a question to fall within this exception, it must "serve a legitimate administrative need." *Id.*

---

[8] Specifically, Officer Ortega testified that she "asked them who was the person in charge of the residence." *See* Docket No. 94, pgs. 18-19.

While the First Circuit has not addressed this specific question, other circuit court decisions prove instructive. For example, in *United States v. Gaston*, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") concluded that questions regarding the ownership of a searched property fell within the routine booking exception because they served a legitimate administrative need. *See* 357 F.3d 77, 82 (D.C. Cir. 2004). The Court finds the *Gaston* decision's reasoning persuasive and applicable to the case at bar. Similarly to the officers in *Gaston*, Officer Ortega testified that she asked for the owner of the house to present them with the search warrant and because that person would need to accompany the officers throughout the search. *See* Docket No. 94, pg. 83. As such, the Court finds that the question served a legitimate administrative need and therefore **DENIES** Mr. Ramos-Bonilla's request to suppress his answer regarding ownership of the house.

Second, Mr. Ramos-Bonilla avers that asking him if he had a cannabis license amounted to an interrogation, for which he should have been read the *Miranda* warnings. *See* Docket No. 66, pg. 2; *see also* Docket No. 114, pg. 3. The Parties agree that Officer Ortega did not give Mr. Ramos-Bonilla the *Miranda* warnings prior to asking him if he had a cannabis license. *See* Docket No. 61, pg. 2. The Court notes that this matter is one of

first impression in this District.

"[T]he Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 190 (2004) (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). The First Circuit has described this inquiry as an objective one, asking "how would the officer's statements and conduct be perceived by a reasonable person in the same circumstances[.]" *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996).

The Court understands the central inquiry to be whether Mr. Ramos-Bonilla reasonably believed that his answer as to whether he possessed a cannabis license would be used to incriminate him. In other words, whether Mr. Ramos-Bonilla held a "real and appreciable fear" that the information solicited would be used to incriminate him. *See Hiibel*, 542 U.S. at 190. The Court answers in the affirmative and finds that suppression of his answer is warranted. A reasonable person in Mr. Ramos-Bonilla's circumstances would have a real fear that the information regarding whether he had a cannabis license would be used to incriminate him—especially considering that the answer could affirm illegal possession of a controlled

substance.[9] That is, it would force the suspect to admit culpability.[10] Accordingly, upon a finding that asking Mr. Ramos-Bonilla whether he had a cannabis license elicited an incriminating result, and given that he was in custody, the Court **GRANTS** Mr. Ramos-Bonilla's request to suppress his answer to that question.

---

[9] For example, the question regarding whether Mr. Ramos-Bonilla had a permit to legally possess cannabis is similar to when a police officer asks an individual if he possesses a gun permit. When an officer inquires whether a person has a gun permit, it is likely that he is trying to determine if the person is in lawful possession of a gun. *See United States v. Hicks*, 546 F.Supp.2d 1378, 1383 (N.D. Ga. 2008) (finding that the police officer asking for a gun permit was trying "to determine whether [the defendant] was in lawful possession of [a] gun."). Federal courts have found that asking if a suspect has a permit to carry a firearm is an incriminating question. *See U.S. v. Farinacci-García*, 551 F.Supp. 465, 475-76 (D.P.R. 1982) (suppressing statements made regarding a firearm, including that he did not have a permit); *see also U.S. v. Wiggins*, No. 12-6114, 2013WL1645180, at *7 (W.D.N.Y. April 16, 2013) ("Numerous courts have found that custodial questioning concerning whether an individual has a permit to carry a weapon is 'reasonably likely to elicit an incriminating response.'" (citation omitted)). The Court finds this jurisprudence to be instructive as to the cannabis license question.

[10] The Court notes that under Puerto Rico law, any person may legally possess cannabis when prescribed and in accordance with the applicable laws and regulations. *See* P.R. Laws Ann. tit. 24, §§ 2623-2623b. Accordingly, a person with a medical cannabis license may still be found to be illegally possessing cannabis, if they are doing so in a way that contravenes the applicable laws and regulations. Thus, any person within the jurisdiction of Puerto Rico would reasonably suspect that the information they give a PRPB officer regarding whether they have a medical cannabis license may be used to incriminate him, either for unauthorized possession of cannabis, or for possessing it with authorization but in a manner contrary to law.

Lastly, Mr. Ramos-Bonilla contends that his statements regarding whether he had a gun permit should be suppressed. *See* Docket No. 114, pgs. 3-4. First, he reasons that the Court should discredit Officer Ortega's testimony and find that she did not read Mr. Ramos-Bonilla the *Miranda* warnings prior to asking him if he had a gun permit. *Id.* at pgs. 1, 4-7. Alternatively, if the Court credits Officer Ortega's testimony, Mr. Ramos-Bonilla argues that the Court should find that Officer Ortega did not honor his right to remain silent. *Id.* at pgs. 3-4.

Mr. Ramos-Bonilla attempts to undermine Officer Ortega's credibility by pointing to the lack of corroborating testimony. *Id.* at pgs. 4-7. He first notes that there is no documentary evidence supporting Officer Ortega's testimony. *Id.* at pg. 5. Specifically, Mr. Ramos-Bonilla highlights that Officer Ortega's incident report did not note at what point, throughout the execution of the search warrant, she read him the *Miranda* warnings (or if she read them to him at all). *Id.*; *see also* Docket No. 94, pg. 79. According to Mr. Ramos-Bonilla, "[t]hese are material omissions that should detract from the reliability of [Officer] Ortega's testimony." *See* Docket No. 114, pg. 5.

The Court finds that, while Officer Ortega omitted some details in her incident report, as she herself concedes, *see* Docket No. 94, pg. 79, these omissions do not gravely undermine Officer Ortega's credibility. *See United States v. Lugo Vélez*, Case No. 25-338, 2026WL1283045 at *4 (D.P.R. May 8, 2026) (finding that omissions in a police incident report did not undermine a police officer's credibility because there was a satisfactory explanation for the same). That is especially true since, as Officer Ortega explains, incident reports are generated mostly for statistical purposes, even if some information regarding the *Miranda* warnings is sometimes included. *Id.*, *see also* Docket No. 94, pgs. 83-84.

Mr. Ramos-Bonilla additionally points out that none of the other witnesses inside the house heard when Officer Ortega purportedly advised Mr. Ramos-Bonilla of his rights. *Id.* at pgs. 5-6. Specifically, he points to the testimony of Officers Burgos, Rivera, Beltrán, and Ms. De Jesús-Flores. *Id.*

First, regarding the two canine handlers—Officers Beltrán and Rivera—the Court gives little weight to their testimony. Both officers testified that they were focused solely on their respective canines throughout the execution of the warrant. *See* Docket No. 103, pgs. 30, 40-42. Likewise, the Court is not convinced that Ms. De Jesús-Flores's testimony

undermines Officer Ortega's credibility. Not only did Ms. De Jesús-Flores described the scene as a chaotic, *see* June 18 Supp. Hr'g. Tr., pgs. 9, 18, she was not even present for the majority of the execution of the warrant, *Id.* at pgs. 9, 19-20 (testifying that she was outside of the house with her children while the execution of the search warrant was taking place).

That leaves the Court with Officer Burgos's testimony to the effects of not remembering having heard Officer Ortega (or any officer) advise Mr. Ramos-Bonilla of his rights while inside the residence. *See* Docket No. 103, pg. 15. After carefully reviewing the record, the Court finds that Officer Ortega read Mr. Ramos-Bonilla the *Miranda* warnings after having asked him if he possessed a medicinal cannabis license. *See* Docket No. 94, pg. 22. In doing so, the Court emphasizes that "'[t]he testimony of a single witness,' even one with credibility problems, can be legally sufficient to prove a fact." *United States v. Cartagena*, 172 F.4th 109, 114 (1st Cir. 2026) (quoting *United States v. Meises*, 645 F.3d 5, 12 (1st Cir. 2011)). Accordingly, the Court directs its inquiry into whether Officer Ortega honored Mr. Ramos-Bonilla's right to remain silent.

Mr. Ramos-Bonilla posits that re-questioning him after advising him of his right to remain silent and counsel was improper. *See* Docket No. 114, pg. 3. Specifically, he reasons that

when he "moved his head and declined to say anything further to Ortega . . . he [had] invoked his right to silence." *Id.* at pg. 4. When a person invokes their right to remain silent, they must do so "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). When they fail to do so, and "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384.[11]

The Court finds that Mr. Ramos-Bonilla did not "unambiguously" invoke his right to remain silent. Had Mr. Ramos-Bonilla stated that "he wanted to remain silent or that he did not want to talk with the police . . . he would have invoked his 'right to cut off questioning.'" *Thompkins*, 560 U.S. at 382 (quoting *Michigan v. Mosley,* 423 U.S. 96, 103 (1975)). Instead, he simply "moved his head" but, as the Supreme Court has held: "[i]f an accused makes a statement concerning the right to counsel [and to remain silent] 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation[] or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."

[11] Mr. Ramos-Bonilla does not argue that he did not understand the *Miranda* warnings given to him or that he was incapable at the time of comprehending them. *See generally* Docket Nos. 57, 66 and 114.

*See Thompkins*, 560 U.S. at 381 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). Therefore, the Court **DENIES** Mr. Ramos-Bonilla's request to suppress his statements regarding whether he had a firearm license.

**B. Statement Made at the Police Station**

Mr. Ramos-Bonilla also contends that his written admission at the Metropolitan Drug Division should be suppressed because it was obtained in violation of his rights under *Miranda*. *See* Docket No. 57, pgs. 4-11. To reiterate, for the challenged admissions to be suppressed, Mr. Ramos-Bonilla must have been in custody and interrogated without having received his *Miranda* warnings. *McCarty*, 475 F.3d at 45. Given that when Mr. Ramos-Bonilla gave his written statements he was under arrest, the Court finds that the custody element is clearly satisfied. *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Thus, the Court focuses its analysis on the second element, interrogation.

Mr. Ramos-Bonilla contends that his invocation of his Fifth Amendment right to counsel on the PRPB *Miranda* form, "should have precluded any subsequent police questioning." *See* Docket No. 57, pg. 4. Furthermore, Mr. Ramos-Bonilla posits that the police failed to honor his right to remain silent by interrogating him. *Id.* at pg. 10. The Government counters by

affirming that Mr. Ramos-Bonilla's statements were offered voluntarily. *See* Docket No. 61, pg. 7.

Because there is no question that Mr. Ramos-Bonilla invoked both his right to remain silent and his right to counsel by signing the PRPB *Miranda* form, the Court turns to whether the statement he offered was the product of an illegal interrogation. *See United States v. Fernández*, 716 F. Supp.3d 8, 20 (D.P.R. 2024); *see also Lugo Vélez*, 2026WL1283045 at *5, n. 5.

According to the Government, around thirty minutes after signing the PRPB *Miranda* form, Mr. Ramos-Bonilla spoke to Officer Ortega, manifesting his desire to keep Ms. De Jesús-Flores out of the case. *See* Docket No. 61, pg. 4; Docket No. 113, pg. 4. Indeed, Officer Ortega's testimony is that, after filling out the PRPB *Miranda* form, Mr. Ramos-Bonilla expressed that "he wanted [Ms. De Jesús-Flores] to remain out of the process, and that everything . . . found in the residence was his." *See* Docket No. 94, pgs. 39-40.

Officer Ortega's testimony contradicts that of Ms. De Jesús-Flores. *See* June 18 Supp. Hr'g. Tr., pgs. 15-16. As previously noted, she testified that Officer Ortega approached Mr. Ramos-Bonilla and told him "[t]hat she was going to bring him a form for him to fill out in order to exclude both [her and her children from the case]." *Id.* After signing the Suspect

Statement Form, Ms. De Jesús-Flores testified that her, and her eldest son, were released from custody. *Id.* at pg. 17.

Officer Ortega's testimony also contradicts Mr. Ramos-Bonilla's written statement under penalty of perjury. *See* Docket No. 57-1. He affirmed that, around two hours after having signed the PRBP *Miranda* form, Officer Ortega re-approached him and commented that, were he to accept responsibility, both Ms. De Jesús-Flores and her eldest son would not be prosecuted and that the PRPB would not contact the Family Department. *Id.* at pg. 2.

When determining the credibility of a witness, a trial court must not only consider the "demeanor and inflection" of a witness, but also "[d]ocuments or objective evidence [that] may contradict the witness' story; or the [fact that the] story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). Here, the Court credits Officer Ortega's testimony and finds that Mr. Ramos-Bonilla's written statement was offered voluntarily. Aside from the Court's assessment of Officer Ortega's demeanor during the Suppression Hearing, the Court also notes that Officer Ortega's testimony is internally coherent. By her account, Mr. Ramos-Bonilla had previously mentioned that

he wanted to keep Ms. De Jesús-Flores out of the case. *See* Docket No. 94, pg. 24. It is thus consistent that Mr. Ramos-Bonilla would want to exclude his consensual partner from any potential liability and would voluntarily assume responsibility for the contraband found at the house. Despite testimony to the contrary, the Court is not moved to conclude that Officer Ortega's recount of the events is implausible. *See City of Bessemer City, N.C.*, 470 U.S. at 575. The Court therefore determines that Mr. Ramos-Bonilla proffered his written statement of his own volition.[12] Accordingly, the Court **DENIES** Mr. Ramos-Bonilla's petition to suppress his written statement. *See Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of

[12] The Court notes that there is some controversy regarding whether Officer Ortega spoke to Mr. Ramos-Bonilla and Ms. De Jesús-Flores about contacting the Family Department and about the extent of these exchanges. *See* Docket No. 114, pgs. 8-9. The Government concedes that Officer Ortega asked them for some information regarding their children and invites the Court to construe those questions as "passing remarks." *See* Docket No. 113, pgs. 8-9. Mr. Ramos-Bonilla, for his part, argues that Officer Ortega had no reason to ask him about his children because she already had the contact information of the children's grandmother, who had previously been called and had the custody of the children. *See* Docket No. 114, pg. 9. The Court finds that Officer Ortega's brief remarks regarding the Family Department did not constitute an "illegal interrogation." *See United States v. López*, 380 F.3d 538, 546 (1st Cir. 2004) (finding that "passing remark[s]" did not constitute an interrogation); *see also Innis*, 446 U.S. at 303. The Court underscores that Officer Ortega had previously informed both Mr. Ramos-Bonilla and Ms. De Jesús-Flores that the Family Department was contacted during the execution of the search warrant. *See* Docket No. 94, pg. 29.

course, admissible in evidence.”).

## III. Conclusion

In light of the above, Mr. Ramos-Bonilla’s Motion to Suppress at Docket No. 57 is **DENIED in part and GRANTED in part**. Specifically, the Court **GRANTS** his request to suppress his statement concerning the cannabis license and **DENIES** his request, with respects to the rest of the challenged statements.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 5th day of November 2026.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE